to present prejudicial error requiring an interference with the report of the referee.   The report of the referee as to the damages should be sustained.

Judgment affirmed, with costs.   All concur.

---

NEW YORK BANK-NOTE CO. v. KINGS COUNTY EL. RY. CO. et al.

(Supreme Court, Appellate Division. First Department.   February 10, 1899.)

CONTRACT—CONSTRUCTION—OPTION.

> In a contract for printing tickets, a railroad ordered 100,000,000, and agreed to order at its "option," at any time within five years, 100,000,000 more, provided the first were satisfactory.   It was to take all its tickets from the printing company for five years, whether they amounted to 100,000,000 or 200,000,000.   In consideration of taking the second 100,-000,000, the price had been reduced, the time of taking extended to within five years, and a provision for the acceptance of the second 100,000,000 was changed from "may" be accepted to "shall" be accepted.   Held, that the "option" referred to the time of ordering the second 100,000,000, and not to the obligation to take.

Appeal from trial term, New York county.

Action by the New York Bank-Note Company against the Kings County Elevated Railway Company and others.   There was a judgment for defendants, and plaintiff appeals.   Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

Edward P. Lyon, for appellant.

Charles L. Kingsley, for respondents.

· INGRAHAM, J.   This action was brought to recover the damages caused by the refusal of the defendant railway company to order 99,000,000 of tickets, which the plaintiff alleges it had bound itself to do by a contract, a copy of which is annexed to the complaint.   The complaint alleges the execution of the contract; that the plaintiff furnished thereunder 101,000,000 tickets, which were accepted by the railway company as satisfactory, and requested from said company "the data for the remaining ninety-nine millions tickets contemplated by said agreement," but that the railway company refused to furnish the plaintiff with requisitions or data for printing said tickets, and has prevented the plaintiff from carrying out the said contract in that regard.   These allegations of the complaint are admitted by the answer.   The case came on for trial before a jury, and the plaintiff offered testimony as to the negotiations which led up to the agreement, and the modifications made by the parties to the original draft of the agreement as first submitted.   The court, pending a motion for the direction of a verdict for the defendants, submitted to the jury the question as to whether the word "shall," in the last clause of the contract, was substituted for the word "may," as testified to by the plaintiff's president.   The jury answered that question in the affirmative, and the court then directed the jury to find a verdict for the defendant.

The agreement was dated February 7, 1888, and by it the bank-note company agreed to furnish the railway company with all the tickets used by the latter, and to deliver, as nearly as possible, upon the 1st day of March, 1888, sufficient tickets for the continuous use of the railway company for their sales at such stations as the railway company should select, and thereafter to keep a continuous supply for their constant demands.    The contract then provided that "the railway company hereby orders from the bank-note company one hundred million of tickets, and agrees to order, at the option of the said railway company, at any time not exceeding a longer period than five years from the date hereof, one hundred million of tickets more, provided the previous tickets have been accepted as satisfactory."    The question in dispute arose as to the proper construction to be given to this last clause,—whether it was an absolute agreement of the defendants to order 200,000,000 tickets, as the plaintiff contends, or an order for 100,000,000 tickets, with the option on the part of the railway company to order an additional 100,000,000, as claimed by the defendants. By another clause of the contract it is agreed "that the railway company shall order and take from the bank-note company all of its tick-ets for five years from the date hereof, whether the number shall be one hundred million or two hundred million, more or less."    Thus, the plaintiff undertook to deliver to the defendants, for a definite period, all the tickets required by the railway company at such railway stations as the railway company may select, at 20 cents per 1,000; and the railway company agreed to order and take from the bank-note company all the tickets that it should require for five years from the date of the contract, whether the number shall be 100,000,000 or 200,000,000, more or less.    These obligations are plain.    The plaintiff is to furnish all the tickets that the railway company needs, and the railway company is to order and purchase from the plaintiff all the tickets used in the operation of their road for five years from the date of the contract; and, in addition to these reciprocal obligations, the railway company orders 100,000,000 tickets, and agrees to order an additional 100,000,000 provided the previous tickets shall have been accepted as satisfactory.

This contract would all be clear were it not for the insertion of the words "at the option of the railway company," after the agreement to order the additional 100,000,000 tickets.    Was it intended by the use of these words that the railway company should have the option to order this second 100,000,000 of tickets or not, as it pleased?    It must have been the intention to impose an obligation upon one of the parties to the contract.    There was either an obligation upon the bank-note company to furnish the tickets if ordered by the railway company, or an obligation of the railway company to order the tick-els.    This clause, however, did not relate to an obligation of the plain-tiff, but to an obligation assumed by the railway company.    By it the latter company ordered 100,000,000 tickets, and agreed to order another 100,000,000.    It had been before provided that the plaintiff should furnish the railway company with all the tickets required for the operation of its road.    The railway company then ordered 100,000,-000 tickets, and undertook to order another 100,000,000, and further

agreed to order and take from the plaintiff all the tickets that it should need for five years. This construction makes the different clauses of the contract consistent, and gives effect to the words used. We must then determine what was intended by the insertion of the option. Is it possible to connect this option with any subject other than that of the agreement to order the tickets?

Here the element of time becomes important to be considered. The tickets were to be manufactured by the plaintiff, and to be paid for when delivered to the defendants. From the testimony as to the negotiations between the parties it appears that there was a material difference in the price at which the plaintiff offered to supply the tickets, depending upon the quantity to be furnished. The first proposition that the plaintiff made as to the price was that the first 100,000,000 tickets should be at the rate of 22½ cents per 1,000, and the second 100,000,000 at 20 cents per 1,000. The railway company insisted, however, that the plaintiff should furnish all the tickets for 20 cents per 1,000; and it was then agreed that, if the railway company would take 200,000,000 tickets, the plaintiff would furnish them at 20 cents per 1,000. The plaintiff's president testified that the railway company's president said, "If you will make it twenty cents for the whole two hundred millions, we will change this subsequent delivery from they 'may' take it to they 'shall' take it." Attention will be called to this clause later. As a further inducement for the plaintiff to fix the price at 20 cents, the railway company's president said that "they would undoubtedly want the whole two hundred millions during the first five years, but the contract should be so arranged that they should have to the end of the five years to order the second hundred millions."

Viewed in the light of this testimony, the obligations assumed by the parties seem quite clear. As before stated, the plaintiff was to furnish the railway company with all the tickets used in the operation of the road, at the rate of 20 cents per 1,000, and the railway company was to purchase from the plaintiff all the tickets that it required for five years from the date of the contract, whether the number be 100,000,000 or 200,000,000, more or less. The railway company ordered 100,000,000 tickets, which it was bound to take and pay for when delivered. It further agreed to order an additional 100,000,000 tickets, but the time of giving that order was at the option of the railway company, and it was conditioned upon the acceptance of the tickets delivered by the plaintiff on the first order as satisfactory. This is confirmed by the last clause of the agreement, which provided that the first 100,000,000 tickets were to be accepted by the railway company as follows: 25,000,000 tickets as soon as tendered, 25,000,000 at any time after the lapse of six months from the date of the contract, and the remaining 50,000,000 at any time after the expiration of one year from the date of the agreement; and then provision is made for the receipt of the second 100,000,000 tickets. The remaining 100,000,000 tickets were to be accepted by the railway company at its option at any time within five years from the date of the contract. We see by this clause that the option of the railway company was not whether the tickets should be ordered and delivered, but at what time the delivery should be made, so that the railway company

could receive and pay for the tickets at any time during the five years that the contract was to continue. Under this clause of the agreement, there was a distinct obligation assumed by the railway company to accept the tickets. The railway company had the option, not as to whether it would accept the tickets at all, because the contract was imperative that it should accept, but as to the time of acceptance. It was in this last clause of the agreement that the jury found that the language had been changed at the suggestion of the president of the railway company in consideration of the plaintiff's reducing the price of the first 100,000,000 tickets from 22½ cents per 1,000 to 20 cents per 1,000. The contract as originally drafted provided that the delivery of the remaining 100,000,000 "may" be accepted; and, in consideration of the reduction in the price of the tickets, the language of this clause was changed so as to read "shall" be accepted, as it appears in the contract as executed. "When the language used in a contract is susceptible of more than one interpretation, the court will look at the surrounding circumstances existing when the contract was entered into, the situation of the parties, and of the subject-matter of the instrument." French v. Carhart, 1 N. Y. 102; Coleman v. Beach, 97 N. Y. 553. Considering the whole contract in the light of the object sought to be attained, the obligations assumed by the respective parties, and this significant change in the paragraph which required the railway company to accept the tickets, we think that the only conclusion that can give effect to the provisions of the contract is to construe it as an absolute obligation to order, accept, and pay for the second 100,000,000 of tickets, the time within five years from the date of the contract to be at the option of the railway company.

The judgment must therefore be reversed. The question as to the damages sustained by the plaintiff was not submitted to the jury, and there was no verdict fixing the amount. For this reason we cannot direct a judgment for the plaintiff, under section 1187 of the Code, and we must order a new trial, with costs to the appellant to abide the event. All concur.